RAGNER TECHNOLOGY CORP. and
TRISTAR PRODUCTS INC.,

No. 1:15-cv-7752 (NLH/AMD)

**OPINION**

            Plaintiffs,

      v.

MICHAEL BERARDI, CHERYL
BERARDI, GREG JANSON,
NATIONAL EXPRESS, INC., and
ESTATE OF EDWARD KELLEY,

            Defendants.

**APPEARANCES**:

EDWARD P. BAKOS
NOAM J. KRITZER
BAKOS & KRITZER
147 COLUMBIA TURNPIKE, SUITE 102
FLORHAM PARK, NEW JERSEY 07932
      On behalf of Plaintiffs

THOMAS R. CURTIN
GEORGE C. JONES
GRAHAM CURTIN
4 HEADQUARTERS PLAZA
P.O. BOX 1991
MORRISTOWN, NEW JERSEY 07962-1991
      On behalf of Defendants

**HILLMAN**, District Judge

      This is a Walker Process action related to other patent

infringement litigation pending in the District of New Jersey.

This Opinion addresses two separate but partially overlapping

motions: Defendant National Express, Inc.'s Motion to Dismiss for Failure to State a Claim and Defendants Michael Berardi ("Mr. Berardi") and Cheryl Berardi ("Mrs. Berardi") (collectively the "Berardi Defendants")'s Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim. For the reasons that follow, the Court will grant both motions. The Court will dismiss the claims against Defendants without prejudice and with leave to amend. The Court will dismiss Mrs. Berardi as a party defendant for lack of personal jurisdiction.

## I. Relevant Facts

The following facts come from Plaintiffs' April 29, 2016 Second Amended Complaint.[1] On September 25, 2005, U.S. Patent No. 6,948,527 ("the '527 patent") entitled "Pressure-Actuated Linearly Retractable and Extendible Hose" was issued to Gary Dean Ragner and Robert Daniel deRochemont, Jr. On June 23, 2009, U.S. Patent No. 7,549,448 ("the '448 patent") entitled "Linearly Retractable Pressure Hose" was issued to Ragner. Ragner Technology is the owner and assignee of all rights to the '527 and '448 patents, subject only to exclusive licenses granted to Tristar Products.

In May 2011, Ragner Technology was introduced to Greg

---

[1]     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1337 and 28 U.S.C. § 1331.

Janson, who appeared to be interested in investing in Ragner Technology or bringing Ragner Technology to the attention of potential investors. Janson was hired as a broker to recruit investors for Ragner Technology's patented products.

Janson informed Defendants that Ragner Technology was seeking to meet with investors. Janson scheduled a meeting between Ragner Technology and Defendants for August 23, 2011. On August 23, 2011, Ragner, deRochemont, and Margaret Combs, CEO of Ragner Technology, arrived in Jupiter, Florida for the scheduled meeting. At that time, they learned they were at the home of the Berardi Defendants. Also at the meeting was Edward Kelly, CEO of Defendant National Express. Janson and Vince Simonelli, a business broker, were also present at the meeting. The Berardi Defendants were introduced as Kelly's producers for his television commercials.[2]

At the start of the meeting, Ragner Technology made clear it was seeking investors and not licensing opportunities. Prior to disclosing any confidential information, Combs informed the Berardi Defendants and Kelly that non-disclosure agreements had not been prepared because they had been unaware of whom they were meeting with. Nonetheless, Combs insisted on a non-

---

[2] The Second Amended Complaint states the Berardi Defendants own Berardi Productions, a video production company. Berardi Productions has an exclusive agreement to produce television and online advertisements for National Express's Xhose product.

disclosure agreement before commencing the meeting.  The Berardi

Defendants and Kelly verbally agreed to terms of confidentiality

and non-disclosure for the meeting.  They also agreed to execute

written non-disclosure agreements to be sent by Combs following

the meeting.

After the oral agreement, Ragner Technology "disclosed

information relating to Ragner Technology, the scope of its

patents, product specifications, and target market of the

Microhose product."  They further disclosed

> specific engineering diagrams, ideas, materials of
> manufacture, including but not limited to, prior
> iterations of prototype hoses and prototype hoses
> constructed of more than one layer, more than one
> material, at least one fabric layer, various materials
> of manufacture including but not limited to, vinyl,
> nylon, rubber, polyester, and/or polypropylene, at least
> one layer with cord reinforcement including a hose
> wherein the biasing was performed by elastic material
> such as polymers made of thermoplastic polyurethane to
> provide retracting force, manufacture know-how,
> concepts, etc. related to its prototypes of the
> Microhose product.

Ragner Technology also demonstrated one of the patented

prototypes of the Microhose product.  Mr. Berardi was able to

use one of the patented prototypes and saw it expand and

retract.

During the meeting, National Express articulated its

interest in licensing the patented technology and an intent for

the product to be manufactured in Taiwan.  Ragner Technology

reiterated its request was solely for investors, but also

conveyed its hesitancy to use a foreign manufacturer.  After reassuring Ragner Technology of the capabilities of its foreign manufacturing contact, Kelly requested permission to contact the foreign manufacturer to address its ability to manufacture the product using the patented technology, subject to the terms of the non-disclosure agreement.  Ragner Technology agreed to that limited disclosure.  Kelly indicated he would contact the manufacturer as discussed.

The morning following the meeting, August 24, 2011, Combs prepared the non-disclosure agreements, all dated August 23, 2011.  The non-disclosure agreements were never executed by Defendants.  Ragner Technology was similarly never contacted regarding Kelly's communications with the manufacturer in Taiwan.

A little over two months later, on November 4, 2011, Mr. Berardi filed a patent application entitled "Expandable and contractible hose," which Plaintiffs allege "claim[ed] novel features of the prototypes of the Microhose product demonstrated by Ragner Technology at the August 23, 2011 meeting."  Mr. Berardi obtained U.S. Patent No. 8,291,941 ("the '941 patent"), entitled "Expandable and contractible hose," U.S. Patent No. 8,291,942 ("the '942 patent") entitled "Expandable hose

assembly," and U.S. Patent No. 8,479,776 ("the '776 patent").[3]

Blue Gentian, LLC is the owner of all the rights in the '941, '942, and '776 patents.  Mr. Berardi is a managing member of Blue Gentian.  Blue Gentian, in turn, granted National Express the exclusive right under the '941, '942, and '776 patents to market and sell the expandable hose product.

Plaintiffs filed their initial complaint on May 30, 2014 in the United States District Court for the Southern District of Florida, which was set before the Honorable William P. Dimitrouleas, U.S.D.J.  On June 11, 2015, the Southern District of Florida granted Defendants' Motion for Judgment on the Pleadings and granted leave to file an amended complaint.  This Order was followed by a First Amended Complaint on June 25, 2015.  This matter was then transferred, sua sponte, from the Southern District of Florida to the District of New Jersey on October 28, 2015.  This case was originally assigned to the Honorable Kevin McNulty, U.S.D.J. before being reassigned to the

---

[3]    The Second Amended Complaint further alleges that, on August 3, 2012, the Patent Office issued an Office Action with regard to the applications for what eventually issued as the '941 and '942 patents.  The Second Amended Complaint pleads:

The Office Actions demonstrate[d] that the patent examiner (1) rejected a subset of pending claims as anticipated by the '527 patent, (2) rejected various subsets of pending claims as obvious in light of the '527 patent, and (3) rejected various subsets of pending claims as obvious in light of a combination of the '527 patent and other references.

undersigned on December 2, 2016 because of the pendency of related matters.

Plaintiffs' April 29, 2016 Second Amended Complaint brings three counts against Defendants: conspiracy to monopolize (in the alternative, attempt to monopolize) (Count I); common law fraud (Count II); and breach of contract (Count III).

This Court's Opinion proceeds as follows. The Court first addresses the arguments made that this Court lacks personal jurisdiction over the Berardi Defendants and that venue is improper in the District of New Jersey. The Court then addresses the different jurisdictions' laws it is required to apply in considering these motions, of which there are several. The Court then addresses Count I of the Second Amended Complaint, asserting conspiracy to monopolize and, alternatively, attempt to monopolize. This requires consideration, first, of whether Plaintiffs have antitrust standing and, second, whether Defendants are immune from antitrust liability. The antitrust immunity issue requires consideration of whether there was fraud on the PTO and, if so, the merits of whether Plaintiffs have a monopolization claim. As the Court finds it must dismiss Count I, the Court chooses not to exercise supplemental jurisdiction over Plaintiffs' state law claims for common law fraud and breach of contract. Lastly, the Court considers Plaintiffs' request for leave to amend.

## II. Personal Jurisdiction and Venue

In its February 7, 2018 Opinion, this Court extensively considered whether it had personal jurisdiction over the Berardi Defendants.  The Court determined it had personal jurisdiction over Mr. Berardi but lacked personal jurisdiction over Mrs. Berardi.  The Court asked for supplemental briefing on the personal jurisdiction issue, which the Court timely received on March 9, 2018.  The Court summarizes its February 7, 2018 personal jurisdiction analysis here, incorporating the input of the parties from the supplemental briefing before reaching its ultimate decision.

As this case was transferred from the Southern District of Florida, the Court began by considering any decisions made by that court with regard to personal jurisdiction.  In its order transferring this case to the District of New Jersey, the Southern District of Florida did not specifically address whether this Court has personal jurisdiction over Defendants. Its order found transfer "would serve the interest of justice . . . as the claims in this action may be affected by, and are intricately related to, several pending actions in the District of New Jersey."  The court acknowledged that, while Plaintiffs and National Express consented to transfer (and National Express to jurisdiction in the District of New Jersey), the Berardi Defendants contended that the District of New Jersey

did not have personal jurisdiction over them.  The court concluded: "Plaintiffs acknowledge that Michael Berardi and Cheryl Berardi may attempt to challenge personal jurisdiction in the District of New Jersey.  Nonetheless, Plaintiffs are willing to face that potentiality and request that the Court transfer the action to the District of New Jersey pursuant to § 1404(a)."

Noting that "[a]n action can be brought only where the court has personal jurisdiction over defendants" and that "a court does not have authority to transfer a case to a court that lacks personal jurisdiction," Hunt v. Global Incentive & Meeting Mgmt., No. 09-4921, 2010 WL 3740808, at *8 (D.N.J. Sept. 20, 2010) (citing Sunbelt Corp. v. Noble Denton & Assocs., Inc., 5 F.3d 28, 31-33 (3d Cir. 1993)), the Court found the Southern District of Florida necessarily and implicitly concluded that the District of New Jersey had personal jurisdiction over all Defendants in determining it was appropriate to transfer the case to the District of New Jersey.  Thus, this Court concluded that the law of the case was that this Court has personal jurisdiction over Defendants.

Noting that "[a] district court may reconsider a previous decision that has become law of the case . . . where the decision was clearly erroneous and would work a manifest injustice," Alexander v. Frankling Res., Inc., Nos. 07-848, 07-1309, 2007 WL 2021787, at *2 (D.N.J. July 9, 2007), the Court

visited the issue of personal jurisdiction solely to determine whether the decision was clearly erroneous and would work a manifest injustice.

After concluding that the Berardi Defendants did not waive their argument that this Court does not have personal jurisdiction, the Court considered whether the Berardi Defendants "have certain minimum contacts" with New Jersey "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

The Court determined that nearly all of the allegations asserted in Plaintiffs' Second Amended Complaint regarding Mr. Berardi's contacts with the forum state relate to his contacts in his capacity as Managing Member of Blue Gentian and as an officer of Berardi Productions. Similarly, Mrs. Berardi's contacts with the forum state relate solely to her contacts in her capacity as an officer of Berardi Productions. Accordingly, this Court turned to whether it was proper for the Court to consider the Berardi Defendants' contacts with the forum state while acting on behalf of either Blue Gentian or Berardi Productions. The Court determined that, if the Second Amended Complaint sufficiently alleged the Berardi Defendants could be subject to individual liability, it was proper to consider

actions taken by the Berardi Defendants in their corporate capacities in its personal jurisdiction analysis to the extent those actions were done within New Jersey.

The Second Amended Complaint alleges Mr. Berardi, "as the sole managing member of Blue Gentian," "direct[ed] Blue Gentian, LLC to restrain competition in part in the State of New Jersey by suing competitors claiming infringement and threatening their customers." The complaint specifically pinpoints two 2013 law suits filed in the District of New Jersey: dockets 13-481 and 13-7099. As to both Berardi Defendants, the Second Amended Complaint states the Berardi Defendants direct Berardi Productions to produce anticompetitive commercials "which air in the State of New Jersey." It further states the Berardi Defendants "write, produce, direct, and edit" the anticompetitive advertisements that air in New Jersey.

At this point, the parties' supplemental briefing becomes relevant. The Court's February 7, 2018 Opinion found the Second Amended Complaint sufficiently supported personal jurisdiction over Mr. Berardi based on his contacts through Blue Gentian. The Court based this decision on the 13-481 action and the 13-7099 action, of which Blue Gentian and National Express are both Plaintiffs. The Court found the filing of these actions constituted the minimum contacts necessary for this Court to assert personal jurisdiction over Mr. Berardi, finding Mr.

Berardi took specific action and directed the filing of these lawsuits in his capacity as managing member. The Court found that in using the federal court system in New Jersey to allegedly conspire or attempt to monopolize a market with fraudulently obtained patents, Mr. Berardi purposefully availed himself of the privilege of conducting activities in the State of New Jersey. Mr. Berardi was invoking the benefits and protections of the District of New Jersey, located in the forum state. If such use was fraudulent or constituted a conspiracy or attempt to monopolize, Mr. Berardi could reasonably expect to be haled into court in the state in which he filed the lawsuits. The Court also found exercising personal jurisdiction over Mr. Berardi comported with fair play and substantial justice.

In its supplemental briefing, Defendants informed the Court that the 13-481 action was originally filed in the Southern District of Florida before it was transferred to the District of New Jersey on Defendant Telebrands Corp.'s Motion to Transfer. The Court thus will not base a finding of personal jurisdiction on the filing of the 13-481 action. However, the Court finds the filing of the 13-7099 action supports a finding of personal jurisdiction. Defendants' supplemental briefing provides as follows on this issue:

> The 13-7099 action was filed by Blue Gentian and National Express in the District of New Jersey, alleging infringement of U.S. Patent No. 8,479,776 ("the '776

patent"), and to add a retail defendant to infringement allegations already pending in the 13-1758 action. The 13-7099 action was filed as, and was identified as, related to the 13-1758 action that was pending in the district. The 13-1758 action alleged Tristar's infringement of the '941, '942, and '213 patents – the '776 patent is a continuation-in-part of those patents. . . . Because many of the same issues from the 13-7099 action were already pending in the 13-1758 action, 13-7099 action needed to be filed in the district where the 13-1758 action was pending. The 13-1758 action, however, was not directed to New Jersey by Blue Gentian and Mr. Berardi, but rather by Defendants Tristar Products, Inc. . . .

Blue Gentian filed the lawsuit that became the 13-1758 action in the Southern District of Florida on October 23, 2012. . . . On March 19, 2013, however, Judge Seitz granted Tristar's Motion and transferred the action to New Jersey, where it was reassigned to District Judge Hochberg and Magistrate Judge Shwartz as the 13-1758 action. . . .

The 13-1758 action had been transferred to New Jersey based on Tristar's motion, and was pending for just over six (6) months when the 13-7099 action was filed. Because the issues under 28 U.S.C. § 1404(a) had been litigated and ruled upon with respect to the 13-1758 action, and because the 13-7099 action had the same issues for a court to address, it was not a decision by Blue Gentian and Mr. Berardi that directed the 13-7099 action to New Jersey, but plaintiffs abiding by the Florida court's prior ruling. Having already ruled on the issue relating to where the infringement issues should be heard, it would have been improper for Blue Gentian to then file a new action with substantially the same claims in the Southern District of Florida.[4]

---

[4]    In Plaintiffs' Motion for Leave to File Reply, Plaintiffs request the Court ignore Defendants' supplemental briefing, arguing that it "amounts to re-argument of the issues already briefed and decided" and "is improper in the absence of a Motion for Reconsideration." The Court notes that the supplemental briefing contains arguments that might have been more appropriate for a motion for reconsideration, considering that the Court determined in its February 7, 2018 Opinion the personal jurisdiction issue and was merely asking for briefing on how to proceed. However, given that the arguments do not change this Court's analysis, and given the unique question this

The Court confirms the following. On November 21, 2013, Blue Gentian and National Express filed a complaint in the District of New Jersey, bringing claims for direct patent infringement and indirect patent infringement against Tristar Products. This was docketed as the 13-7099 matter. In the Complaint's Local Civil Rule 11.2 Certification,[5] the 13-7099 Complaint stated:

> Plaintiffs, by their undersigned counsel, hereby certify pursuant to L.Civ.R. 11.2 that the matters in controversy are not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding, with the exception of the following:
>
> (1) <u>Telebrands Corp. v. National Express, Inc., et al.,</u> Civil Action No. 12-cv-06671-FSH-JBC;
>
> (2) <u>Blue Gentian, LLC v. Telebrands Corp.,</u> Civil Action No. 13-00481-FSH-JBC;
>
> (3) <u>Blue Gentian, LLC, et al. v. Tristar Prods., Inc.,</u> Civil Action No. 13-cv-01758-FSH-JBC; and
>
> (4) <u>Blue Gentian, LLC, et al. v. Telebrands</u>

Court presented the parties with for supplemental briefing, the Court finds it proper to address Defendants' concerns here.

Plaintiffs also ask for the opportunity to oppose Defendants' supplemental briefing if the Court chooses to consider it. Given that the Court is not persuaded by Defendants' briefing, the Court denies that request.

[5]    Local Civil Rule 11.2 requires, in pertinent part, as follows: "The initial pleading . . . in any case in this Court . . . shall be accompanied by a certification . . . as to whether the matter in controversy is the subject of any other action pending in any court . . . and, if so, the certification . . . shall identify each such action . . . ."

<u>Corp., et al</u>, Civil Action No. 13-cv-04627-FSH-JBC.

On November 15, 2013, counsel for the parties participated in a scheduling and status conference with United States Magistrate Judge James B. Clark for the above-indicated related actions. During the conference undersigned advised the Court of the impending filing of the present Complaint. <u>Judge Clark specifically instructed undersigned to file this action as a related case to the actions indicated above, to facilitate the Court's consolidation thereof for pretrial scheduling.</u>

(emphasis added).

The Court understands Blue Gentian's rationale in filing the 13-7099 action in the District of New Jersey. Plaintiffs' perception that the same transfer analysis and action would occur if the 13-7099 action were filed in the Southern District of Florida is both understandable and logical. Nonetheless, the Court does not find it shields Mr. Berardi from personal jurisdiction in New Jersey. The Court sees no indication from Defendants' briefing that is was required or instructed, either by this Court or the Southern District of Florida, to file the 13-7099 action in the District of New Jersey. Even understanding that Blue Gentian interpreted its prior interactions with the Southern District of Florida and the District of New Jersey to indicate that the 13-7099 action "needed to be filed" in New Jersey or "it would have been improper for Blue Gentian to . . . file a new action with substantially the same claims [as the 13-1758 action] in the

15

Southern District of Florida," the Court still finds Mr. Berardi, through Blue Gentian, invoked the benefits and protections of the District of New Jersey and thus purposefully availed himself of the privilege of conducting business in New Jersey. The Court thus finds Mr. Berardi is subject to personal jurisdiction in this state.

As to Mrs. Berardi, all parties agreed the claims against her should be severed and dismissed. As this Court explained in its February 7, 2018 Opinion, Berardi Productions' advertisements are insufficient to satisfy the minimum contacts necessary for this Court to assert personal jurisdiction over her. As the content disseminated through Berardi Productions is the only contact Mrs. Berardi is alleged to have with the forum state, the Court found it could not assert personal jurisdiction over Mrs. Berardi. The Court found the Southern District of Florida's implicit conclusion that this Court has personal jurisdiction over Mrs. Berardi clearly erroneous. The Court further found asserting personal jurisdiction over Mrs. Berardi simply to comply with the law of the case would result in manifest injustice. It is fundamentally unfair to require a defendant to litigate a matter in a district in which the defendant lacks sufficient contacts. Further, the Court found that upon "conclud[ing] that the prior decision was 'clearly erroneous,'" this Court is "oblig[ated] to decline

jurisdiction." <u>Christianson v. Colt Indus. Operating Corp.</u>, 486

U.S. 800, 817 (1988). Accordingly, the Court will dismiss the

claims against Mrs. Berardi without prejudice. The Court will

now consider the merits of the claims against Mr. Berardi and

National Express.[6]

### III. Governing Law

Having determined that the Court has subject matter

jurisdiction and personal jurisdiction over the remaining

defendants, and that venue is proper in the District of New

Jersey, the Court now briefly addresses the law it applies in

considering the various issues before it on these motions to

dismiss. In addressing whether Defendants are immune from

antitrust liability, "the requirement that the patent be

---

[6] The Court similarly considered whether the Southern District of Florida's implicit conclusion that venue was proper in the District of New Jersey was clear error. The Court found sufficient allegations in the Second Amended Complaint regarding "events or omissions giving rise to the claim" occurring in New Jersey that it could not conclude the Southern District of Florida's implicit decision that venue was proper constituted clear error.

The Court focused on the conspiracy to monopolize count, as that is what allows this case to proceed in federal court. The Court thus considered the nature of the dispute to be a conspiracy to monopolize or an attempt to monopolize. As noted above, at least one lawsuit was brought by Mr. Berardi in the State of New Jersey, which is part of Plaintiffs' monopolization claim. While there were other significant events occurring in the State of Florida as well, the Court found there were enough contacts in New Jersey that prevented this Court from concluding that it was clear error to determine venue was proper in the District of New Jersey. This Court stands by that ruling.

obtained through actual fraud upon the PTO . . . is governed by Federal Circuit law." Dippin' Dots, Inc. v. Mosey, 476 F.3d 1337, 1346 (Fed. Cir. 2007) (citing Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068 (Fed. Cir. 1998)). The second element, satisfying "the basic elements of an antitrust violation," is governed "by the regional circuit's law." Id. at 1348. This Court will thus apply relevant circuit law in determining whether there was an antitrust violation, id., and to all other questions of federal law. See In re Korean Air Lines Disaster, 829 F.2d 1171 (D.C. Cir. 1987); see also In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368 n.8 (3d Cir. 1993). This Court will apply Third Circuit law, not Eleventh Circuit law. See Desiano v. Warner-Lambert & Co., 467 F.3d 85, 91 (2d Cir. 2006) ("[E]ven in the transfer context, a court of appeals must develop its own circuit law on federal questions; it cannot mechanically adopt the reasoning and conclusions of its sister circuits . . . ."); accord Szulik v. Tagliaferri, 966 F. Supp. 2d 339, 361 n.16 (S.D.N.Y. 2013); In re Gawker Media LLC, 571 B.R. 612, 626-27 (S.D.N.Y. Bankr. 2017) ("Second Circuit law governs the interpretations of federal law even when the case is transferred from a court sitting in another

circuit.").[7]

This Court applies Florida law to the state law claims. "Van Dusen v. Barrack, established that when a civil action is transferred from one district court to another pursuant to § 1404(a) on motion of the defendant, the transferee forum must apply the law of the initial forum." Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 171 (3d Cir. 2011) (citing Van Dusen v. Barrack, 376 U.S. 612, 639 (1964)). "Ferens v. John Deere Co. . . . makes plain that the Van Dusen rule applies to sua sponte transfers . . . ." Id.

## IV. Standard of Review

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

---

[7]     The parties in their briefing largely apply Third Circuit law in addressing antitrust standing and conspiracy and attempt to monopolize.

Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim. Bogosian v. Gulf Oil Corp., 562 F.2d 434, 446 (3d Cir. 1977). However, "the Federal Rules of Civil Procedure . . . do require that the pleadings 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Baldwin Cty. Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3 (1984) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

A district court, in weighing a motion to dismiss, asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Bell Atl. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly.").

## V. Antitrust Standing

The Court first addresses whether Plaintiffs have antitrust standing. Both motions allege lack of standing as a basis for dismissing this action.

"Article III constitutional standing, a principal moored in the notion 'that the judiciary's power only extends to cases or controversies,' constitutes a threshold requirement in all actions in federal court." Otsuka Pharm. Co. v. Torrent Pharms. Ltd., 118 F. Supp. 3d 646, 652 (D.N.J. 2015) (quoting Ethypharm S.A. Fr. v. Abbott Labs., 707 F.3d 223, 232 (3d Cir. 2013)). "The principles of constitutional standing are, however, 'augmented' by prudential considerations aimed at preserving the effective enforcement of the antitrust laws." Id. "[T]he Supreme Court has specifically recognized that 'Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.'" Id. (quoting Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 (1983)). Accordingly, where a plaintiff brings suit under federal antitrust laws, the plaintiff must meet the prudential requirement of antitrust standing.

The following factors "are relevant in an antitrust standing challenge":

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns

that liberal application of standing principles might
produce speculative claims; (4) the existence of more
direct victims of the alleged antitrust violations; and
(5) the potential for duplicative recovery or complex
apportionment of damages.

Barton & Pittinos v. Smithkline Beecham Corp., 118 F.3d 178, 181

(3d Cir. 1997) (quoting In re Lower Lake Erie Iron Ore Antitrust

Litig., 998 F.2d 1144, 1165-66 (3d Cir. 1993)).  "The second

factor, antitrust injury, 'is a necessary but insufficient

condition of antitrust standing.'"  Ethypharm, 707 F.3d at 233

(quoting Barton & Pittinos, 118 F.3d at 182).  "If it is lacking

[the court] need not address the remaining . . . factors."  Id.

(emphasis omitted).  Accordingly, this Court begins by

considering whether Plaintiffs have sufficiently pleaded an

antitrust injury.

Generally, antitrust injury – that is, "injury of the
type the antitrust laws were intended to prevent and
that flows from that which makes [the] defendants' acts
unlawful," "is limited to consumers and competitors in
the restrained market and to those whose injuries are
the means by which the defendants seek to achieve their
anticompetitive ends."

Id. (alteration in original) (first quoting Brunswick Corp. v.

Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977); and then

quoting W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d

85, 102 (3d Cir. 2010)); accord Otsuka, 118 F. Supp. 3d at 652-

63 ("[I]n order to plead an antitrust injury, the party must

allege facts showing (1) that it suffered an injury of the type

the antitrust laws seek to prevent, e.g., anticompetitive

behavior, and (2) that the injury resulted from the adversary's unlawful or anti-competitive acts.").

Further, "a plaintiff must generally show that he is a competitor or a consumer in the relevant product and geographic markets in which competition was adversely impacted." Novak v. Somerset Hosp., 625 F. App'x 65, 67 (3d Cir. 2015); Bocobo v. Radiology Consultants of S. Jersey, P.A., 305 F. Supp. 2d 422, 425 (D.N.J. 2004) ("To determine if Plaintiff has suffered an antitrust injury, the Court must determine if competition in the relevant market has been impermissibly affected, which, of course, requires the Court to define the relevant market or markets."). The Court thus begins its assessment of whether an antitrust injury, and consequently whether antitrust standing, has been pleaded adequately by considering the relevant product market and geographic market.

**A. Relevant Product Market**

Plaintiffs plead the relevant product market is the "expandable hose market." The Court finds the relevant product market has not been sufficiently defined, as explained below, and is grounds for dismissal.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Queen City Pizza v. Domino's Pizza, 124 F.3d 430, 436 (3d Cir.

1997) (quoting <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962)); <u>accord</u> <u>Novak</u>, 625 F. App'x at 67 ("The relevant 'product market' is comprised of 'commodities reasonably interchangeable by consumers for the same purposes.'" (quoting <u>United States v. E.I. Du Pont de Nemours & Co.</u>, 351 U.S. 377, 394 (1956))). "Interchangeability 'implies that one product is roughly equivalent to another . . . [and] while there might be some degree of preference for the one over the other, either would work effectively.'" <u>Id.</u> (alteration in original) (quoting <u>Allen-Myland, Inc. v. Int'l Bus. Machs. Corp.</u>, 33 F.3d 194, 206 (3d Cir. 1994)).

"[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." <u>Queen City Pizza</u>, 124 F.3d at 436. However,

> [w]here the plaintiff fails to define its proposed market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

<u>Id.</u>

Plaintiffs' Second Amended Complaint did not "define its proposed market with reference to the rule of reasonable interchangeability or cross-elasticity of demand." <u>Id.</u> The

24

Court thus finds the relevant market as pleaded to be legally insufficient.[8]

The Court recognizes that this conclusion differs from the Southern District of Florida's decision. The Southern District of Florida found the allegations in the initial complaint "adequately define[d] the relevant market at this stage in the litigation" as the expandable hose market. The court stated that, "[a]t the pleading stage, Plaintiffs are not required to plead facts regarding the level of product interchangeability, or the cross-elasticity of demand pertaining to the expandable

---

[8]    This Court questions whether the relevant product market pleaded in the Second Amended Complaint is defined too narrowly. "The test for a relevant market is not commodities reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purposes.'" Queen City Pizza, 124 F.3d at 438 (quoting E.I. Du Pont de Nemours & Co., 351 U.S. at 395). "A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general." Id. ("Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. A person needing transportation to work could accordingly buy a Ford or a Chevrolet automobile, or could elect to ride a horse or bicycle, assuming those options were feasible." (quoting Allen-Myland, Inc, 33 F.3d at 206)). "The key test for determining whether one product is a substitute for another is whether there is a cross-elasticity of demand between them: in other words, whether the demand for the second good would respond to changes in the price of the first." Allen-Myland, 33 F.3d at 206. Plaintiffs' have not pleaded or explained why a regular, non-expandable hose, is not included in the relevant product market.

hose market." The Southern District of Florida cited a case from that district for that proposition. This Court, however, applies Third Circuit law. The Third Circuit has explicitly rejected the argument that a plaintiff is not required to plead the relevant market with reference to product interchangeability or cross-elasticity in pleading the relevant product market. Id. ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").

**B. Relevant Geographic Market**

As for the relevant geographic market, Plaintiff's Second Amended Complaint alleges "Defendants are engaged in interstate commerce in the United States, and the vast majority of their past, present, and future sales in the relevant market has and will occur in such commerce." "The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks." Novak, 625 F. App'x at 68 (quoting Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa., 745 F.2d 248, 260 (3d Cir. 1984)).

Plaintiffs plead the relevant geographic market in terms of where Defendants are engaged in interstate commerce. "The law is clear that the relevant geographic market is not defined by the market in which the defendant conducts its business, or even where the injury is felt." Synthes, Inc. v. Emerge Med., Inc., No. 11-1566, 2012 WL 4473228, at *7 (E.D. Pa. Sept. 28, 2012). "Rather, the relevant geographic market is where customers would rationally look for the goods or services he or she seeks." Id. at *22. "The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market." Tunis Bros. Co. v. Ford Motor Co., 925 F.2d 715, 727 (3d Cir. 1991). The Second Amended Complaint fails to properly plead the relevant geographic market. Simply pleading where Defendants are engaged in commerce is completely insufficient to establish the relevant geographic market, even at the pleading stage.

Further, earlier in the Second Amended Complaint, Plaintiffs plead that "Defendant National Express and Blue Gentian, LLC have used the fraudulently obtained '941, '942, and '776 patents to fraudulently obtain international patents to further restrain competition internationally in part by suing Plaintiff Tristar Products and other competitors claiming infringement and threatening their customers in various

international jurisdictions." This statement of the possible international scope of Defendants complicates the analysis. "The relevant geographic market may be local, regional, national or international in origin." Syncsort Inc. v. Sequential Software, Inc., 50 F. Supp. 2d 318, 331 n.10 (D.N.J. 1999). However, "the boundaries of the relevant market must be drawn with sufficient breadth to . . . recognize competition where, in fact, competition exists." Brown Shoe, 370 U.S. at 326. The Second Amended Complaint alludes to an international presence and international competition but does not include it in the relevant market or explain its absence from the relevant market. See generally Synthes, 2012 WL 4473228, at *7 ("Emerge has made no effort to explain why the relevant market is limited to the United States, particularly where Synthes is alleged to be a 'multi-national corporation.'"); Dicar, Inc. v. Stafford Corrugated Prods., No. 05-5426, 2010 U.S. Dist. LEXIS 23667, at *33 (D.N.J. Mar. 12, 2010) ("Where . . . there is no indication that a consumer would be unable to purchase a product abroad, the Court will not arbitrarily limit the geographical market to the U.S.").

Given these deficiencies in pleading the relevant product and geographic markets, the Court will grant both motions to dismiss. However, as the Court will be granting leave to amend the Second Amended Complaint, the Court continues its analysis

in the interest of completeness and guiding Plaintiffs in amending their complaint.

## C. Antitrust Injury

The Court finds the injury alleged is of the type the antitrust laws were intended to prevent. Plaintiffs plead Defendants have used the fraudulently obtained '941, '942, and '776 patents to restrain competition in part by suing Plaintiff Tristar Products and other competitors claiming infringement and threatening their customers.

National Express argues "Plaintiffs' factual allegations only address injury to the Plaintiffs," when "[t]he injury alleged must be to competition in general, and not to the specific competitor." National Express argues <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477 (1977) stands for this proposition. The Supreme Court in that case stated: "The antitrust laws . . . were enacted for 'the protection of <u>competition</u>, not <u>competitors</u>.'" <u>Id.</u> at 488 (quoting <u>Brown Shoe</u>, 370 U.S. at 320); <u>Otsuka</u>, 118 F. Supp. 3d at 653 ("[T]he pleaded facts must show 'that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market,"' rather than just an adverse effect on the particular competitor." (quoting <u>Irish v. Ferguson</u>, 970 F. Supp. 2d 317, 365 (M.D. Pa. 2013))).

The Court finds the injury complained of here is directly

tied to the anticompetitive conduct alleged and is of the type
the antitrust laws intended to prevent. The allegation that
Defendants are using a fraudulently obtained patent to bring
lawsuits against those with valid patents is, to this Court, an
attempt to drive out competition. While it also would inflict a
direct injury against Plaintiffs, as they have been the subject
of some of these lawsuits, the scope of the alleged injury is
broader in that, if Plaintiffs' allegations are true, all
competition in the relevant market is impacted.

For instance, in Otsuka, the District of New Jersey found
an allegation of the initiation of "meritless infringement
actions in order to 'stifle and eliminate competition and
competitors,' to exclude or prevent competitors' entry in
the . . . market, and to maintain its exclusive monopoly over
the . . . market" plausibly alleged an antitrust injury. 118 F.
Supp. 3d at 653. The court found "the pursuit of litigation
that forestalls entry into the generic market . . . constitutes
'anti-competitive behavior' of the type the antitrust laws seek
to prevent." Id. at 654.[9]

---

[9]     Other courts have found similarly.

    In [Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986 (9th
    Cir. 1979)] and [Novo Nordisk of N. Am., Inc. v.
    Genentech, Inc., 885 F. Supp. 522 (S.D.N.Y. 1995)], the
    courts held that the enforcement of a patent obtained by
    fraud may constitute a violation of the Sherman Act,
    provided the other elements of a claim are established.

The Court finds these allegations sufficient to satisfy the "antitrust injury" factor in the factor test for antitrust standing.

### D. Other Antitrust Standing Factors

As for the other factors – causal connection and intent to cause harm, directness of the injury, the existence of more direct victims, and the potential for duplicative recovery or complex apportionment of damages – the Court finds these elements satisfied by the Second Amended Complaint.

The causal connection factor requires us to consider whether the antitrust violation was a but-for cause. Allegheny Gen. Hosp. v. Philip Morris, 228 F.3d 429, 439 (3d Cir. 2000). There is clearly a causal connection alleged between the antitrust violation and the harm to competition and Plaintiffs as market participants. As to intent, this factor, along with causation, is "not . . . dispositive on the issues of antitrust standing." Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, 171 F.3d 912, 925 (3d Cir. 1999). Nonetheless, the Court finds sufficient allegations that the injury alleged

---

This Court reads these cases as conferring antitrust standing upon those who sufficiently plead an antitrust injury based upon the prosecution of a fraudulently obtained patent.

Amgen, Inc. v. F. Hoffmann-La Roche, Ltd., 480 F. Supp. 2d 462, 469 (D. Mass. 2007) (citations omitted).

is the predictable, direct, and intended result of the anticompetitive conduct.[10]

As to the directness of the injury and whether there exist "more direct victims of the alleged antitrust violations," this "involves two inquiries: (1) the appropriate party, and (2) remoteness." Allegheny Gen. Hosp., 228 F.3d at 440. "Subsumed in the 'directness' factor is also the issue of whether other, more directly injured parties could vindicate the policies underlying the antitrust laws . . . ." Steamfitters Local Union, 171 F.3d at 927.

The Court finds that while other entities exist in the expandable hose market, and while others have been subject to patent infringement suits by Defendants (such as Telebrands), Plaintiffs' injury is sufficiently direct. While the Second Amended Complaint seems to suggest that Telebrands could be a more "directly injured" party, the Court's focus in determining violations of antitrust law is in harm to the competition, not to a specific competitor. At the pleading stage, the Court finds this factor sufficiently pleaded. Finally, the Court cannot identify a substantial potential for duplicative recovery

---

[10]    Plaintiffs' Second Amended Complaint also highlights information disseminated into the marketplace which allegedly "evinces the anticompetitive nature of the fraudulently obtained patents," which the Court finds circumstantial evidence of intent.

or complex apportionment of damages at this stage of the litigation.

## VI. Antitrust Immunity

The Court next addresses whether Defendants are immune from antitrust liability.  Both motions claim Defendants are immune from an antitrust claim as a basis for dismissal.  "As a general rule, behavior conforming to the patent laws oriented towards procuring or enforcing a patent enjoys immunity from the antitrust laws."  Unitherm Food Sys. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1356 (Fed. Cir. 2004), rev'd on other grounds, 546 U.S. 394 (2006).  "But this immunity is [not] absolute."  Id. In Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172 (1965), "[t]he Supreme Court recognized that an inventor who obtains a patent by defrauding the patent office deserves no immunity."  Unitherm Food, 375 F.3d at 1356.

"In Walker Process, the Supreme Court held that a plaintiff could bring an action under § 2 of the Sherman Act based on the alleged maintenance and enforcement of a fraudulently-obtained patent."  Transweb, LLC v. 3M Innovative Props. Co., 812 F.3d 1295, 1306 (Fed. Cir. 2016) (citing Walker Process, 382 U.S. at 173-74).  "In order to prevail on a Walker Process claim, the antitrust-plaintiff must show two things: first, that the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced the

patent with knowledge of the fraudulent procurement; and second, all the other elements necessary to establish a Sherman Act monopolization claim." Id. (citing Ritz Camera & Image v. SanDisk Corp., 700 F.3d 503, 506 (Fed. Cir. 2012)).[11]

**A. First Prong of Walker Process: Knowing and Willful Fraud**

"[A] finding of Walker Process fraud . . . must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission." Nobelpharma, 141 F.3d at 1071. The following elemental test has been provided by the Federal Circuit to govern the finding of Walker Process fraud: "(1) that a false representation of a material fact was made, (2) with the intent to deceive, (3) which induced the deceived party to act in justifiable reliance on the misrepresentation, and (4) which caused injury that would not otherwise have occurred." C.R. Bard, Inc. v. M3 Sys., 157 F.3d 1340, 1364 (Fed. Cir. 1998); accord In re Thalomid & Revlimid Antitrust Litig., No. 14-6997, 2015 WL 9589217, at *11 (D.N.J. Oct. 29, 2015).

The Southern District of Florida found the original complaint in this case did not state a plausible Walker Process

---

[11]    As stated above, the Court applies Federal Circuit law to the fraud prong and Third Circuit law to the monopolization prong.

fraud claim.  The court found as follows:

> Here, in the Complaint, Plaintiffs allege generally
> that Defendant Mr. Berardi failed to disclose to the PTO
> "proper identification of inventorship and key prior
> art" when it was known that the "claimed features were
> from the prototypes presented by Ragner Technology."
> However, as plainly indicated on the face of the '941,
> '942, and '776 patents issued to Defendant Mr. Berardi,
> Plaintiff Ragner's '527 and '448 patents were considered
> during the prosecution of Defendant Mr. Berardi's
> patents.  As such, Plaintiffs cannot establish that had
> the PTO been aware of Ragner's patents, Defendant Mr.
> Berardi's patents would not have issued.
> Further, Plaintiffs do not identify with
> particularity what other "key prior art" Defendant Mr.
> Berardi omitted.  Although Plaintiffs allege that
> Plaintiff Ragner disclosed to Defendants "specific
> engineering diagrams, ideas . . . manufacture knowhow,
> concepts related to its prototypes of Microhose
> product," Plaintiffs do not identify what those concepts
> were or which, if any, were withheld from the PTO.
> Likewise, Plaintiffs have not presented particularized
> allegations that but for omission of these unidentified
> ideas, the PTO would not have granted the patents to
> Defendant Mr. Berardi.

(citations omitted).  The Court finds the Second Amended

Complaint cured those defects highlighted by the Southern

District of Florida.  The Court will address each element of a

Walker Fraud claim in turn.

**1. False Representation of a Material Fact**

The Court finds Plaintiffs sufficiently alleged a false

representation of a material fact.  Plaintiffs' Second Amended

Complaint alleges Mr. Berardi failed to disclose the proper

identification of inventorship and key prior art.  Plaintiffs

highlight the following specific misrepresentations in the

Second Amended Complaint:

- "Mr. Berardi filed an Oath and Declaration with the United States Patent and Trademark Office on November 4, 2011 representing that he was the inventor of the expandable and retractable hose that is the subject of the '941 patent, despite knowing that Mr. Ragner was the inventor of the subject of the '941 patent."

- "Mr. Berardi filed an Oath and Declaration with the United States Patent and Trademark Office on June 6, 2012 representing that he was the inventor of the expandable and retractable hose that is the subject of the '942 patent, despite knowing that Mr. Ragner was the inventor of the subject of the '942 patent."

- "On August 15, 2012, Mr. Berardi, during an in-person conference, 'presented a video showing how Mr. Berardi initially manufactured the hose' without informing the examiner that he obtained such information from Mr. Ragner regarding creation of the hose under terms of non-disclosure."

- "Mr. Berardi further 'pointed [to] differences between the [pending claims] and the Ragner et al. reference, mainly the fact that the inner and outer layers of the Ragner et al. hose are bonded together and that the outer layer is plastic material, wherein the [pending claims'] outer layer is formed of a fabric material.'" (alterations in original).

- "Mr. Berardi failed to inform the patent examiner that Mr. Ragner explained, under terms of non-disclosure, that the outer cover of the '527 invention could include a fabric cover, and that the inner and outer layer need not be bonded."

The Court finds these allegations sufficient to show a false representation of a material fact. It is also obvious to the Court that such false representations were with regard to a material fact, i.e., the proper identification of inventorship and prior art, which is clearly a predominant concern in

approving a patent.  See, e.g., PerSeptive Biosystems, Inc. v.
Pharmacia Biotech, Inc., 225 F.3d 1315, 1322-23 (Fed. Cir. 2000)
(finding a district court did not abuse its discretion in
finding inequitable conduct based on "falsehoods,
misrepresentations and omissions . . . directed towards a
central issue – whether the named inventors were the sole
inventors" and based on the inventorship being material).

## 2. Intent to Deceive

"Walker Process intent may be inferred from the facts and
circumstances of a case . . . ."  Dippin' Dots, 476 F.3d at
1347.  "[A] misrepresentation or omission must evidence a clear
intent to deceive the examiner and thereby cause the PTO to
grant an invalid patent."  Nobelpharma, 141 F.3d at 1070.

The Court finds the allegations contained in Plaintiffs'
Second Amended Complaint make a plausible showing of Defendants'
intent to deceive.  Assuming Plaintiffs' allegations regarding
the content of the August 23, 2011 meeting and the above
allegations to be true, as this Court must in considering a
motion to dismiss, the Court finds sufficient circumstantial
evidence of intent, as Defendants, from their attendance at the
August 23, 2011 meeting, could not claim ignorance of the
disclosures made by Plaintiffs at the August 23, 2011 meeting.

## 3. Reliance and Injury

The  Court  similarly  finds  Plaintiffs  have  made  a

plausible showing of both reliance by the Patent Office and that the injury would not have otherwise occurred but for Defendants' fraudulent actions. Plaintiffs' Second Amended Complaint alleges "[t]he USPTO relied on Defendant Mr. Berardi's material false statements and omission as a principal reason for allowing Defendant Mr. Berardi's patent claims to issue." It further alleges that, "[b]ut for these material misrepresentations regarding the scope of the invention disclosed in the '527 patent . . . the '941 and '942 patents would not have issued."

Specifically, Plaintiffs focus on the Office Action initially rejecting the claims based on consideration of the '527 patent. Plaintiffs indicate that, after this initial rejection, Defendants made their alleged fraudulent representations, which resulted in the issuance of the patents to Mr. Berardi. The Court finds these allegations sufficient at this pleading stage.

**B. Second Prong of <u>Walker Process</u>: Sherman Act Monopolization Claim**

**1. Conspiracy to Monopolize**

Plaintiffs' monopolization claim arises under § 2 of the Sherman Act as a "conspiracy to monopolize."[12] Both motions

---

[12] Alternatively, Plaintiffs' Second Amended Complaint brings a claim for attempt to monopolize, which this Court also addresses below.

argue Plaintiffs fail to state a claim for conspiracy to monopolize.

"A Section 2 conspiracy claim has four elements: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 253 (3d Cir. 2010).

The Court starts with the first prong – an agreement to monopolize. "[A] plaintiff must establish the existence of an agreement, sometimes also referred to as a 'conspiracy' or 'concerted action.'" W. Penn Allegheny Health Sys., 627 F.3d at 99. "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." Id. "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two." Id.

The Court finds Plaintiffs pleaded sufficient circumstantial evidence of an agreement to monopolize. Defendants were all present at the August 23, 2011 meeting – National Express by way of Kelly. All Defendants failed to execute written non-disclosure agreements, despite all agreeing to execute such agreements at the August 23, 2011 meeting. Mr. Berardi allegedly obtained the '941, '942, and '776 patents and

then Blue Gentian, of which Mr. Berardi is a managing member, granted National Express the exclusive license to market and sell the '941, '942, and '776 patents. The Court finds this sufficient, non-conclusory, circumstantial evidence of an agreement between Defendants. The Court finds these events also satisfy the second prong, as they similarly show an overt act – in fact, several overt acts – in furtherance of the conspiracy on the part of all Defendants.

The Court now turns to the specific intent prong. "Specific intent is an essential element of a conspiracy to monopolize claim." Howard Hess Dental Labs., 602 F.3d at 257 (citing Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 807 (3d Cir. 1984)). "It means 'an intent which goes beyond the mere intent to do the act.'" Id. (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602 (1985)). "In other words, the defendant must have 'intended to achieve an illegal monopoly.'" Id. (quoting Joseph P. Bauer & William H. Page, II, Kintner's Federal Antitrust Law § 14.40, at 423 (2002)). "Specific intent in the antitrust context may be inferred from a defendant's unlawful conduct." Id.

Plaintiffs' Second Amended Complaint pleads that

Defendants have conspired to monopolize the expandable hose market . . . with specific intent to monopolize by knowingly and willfully omitting and misrepresenting facts in contradiction of the terms of confidentiality and non-disclosure and in connection with the filing and

> prosecution of the patent applications which ultimately
> issued as the '941, '942, and '776 patents.

The Court finds specific intent can be inferred from Defendants' alleged unlawful conduct. The filing of these lawsuits, which Plaintiffs' contend are fraudulent and consequently meritless, evinces an intent to drive others out of the marketplace.

The Court similarly finds the third prong – a causal connection between the conspiracy and the injury alleged – has been satisfied for the same reasons identified with regard to antitrust standing.[13]

### 2. Attempt to Monopolize

The Court also addresses Plaintiffs' alternative claim for attempt to monopolize. "To prevail on an attempted monopolization claim under § 2 of the Sherman Act, 'a plaintiff must prove that the defendant (1) engaged in predatory or

---

[13] The Southern District of Florida found the initial complaint did not allege a plausible conspiracy claim "because Plaintiffs have not alleged sufficient facts showing an 'anticompetitive effect' in the relevant market." The court found only "conclusory allegation[s] that competition ha[d] been harmed." However, this decision was reached by a court in the Eleventh Circuit, which applies the following test: (1) an agreement to restrain trade, (2) deliberately entered into with the specific intent of achieving a monopoly rather than a legitimate business purpose, (3) which could have had an anticompetitive effect, and (4) the commission of at least one overt act in furtherance of the conspiracy. As stated above, the Court applies its own Circuit's interpretation of the governing law.

The Southern District of Florida did, however, find "Plaintiffs ha[d] sufficiently alleged an agreement to conspire, overt acts, and Defendants' intent," as this Court finds here.

anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.'"  Queen City Pizza, 124 F.3d at 442 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)).

The Court finds the first prong – engagement in predatory or anticompetitive conduct – satisfied by the Second Amended Complaint's allegation that Defendants "have used the fraudulently obtained '941, '942, and '776 patents to restrain competition in part by suing Plaintiff Tristar Products and other competitors claiming infringement and threatening their customers."  As for the second prong of specific intent, the Court adopts the same conclusion as under the conspiracy to monopolize claim.

Finally, the Court addresses the third prong – a dangerous probability of achieving monopoly power.  "[P]rov[ing] a dangerous probability of actual monopolization . . . has generally required a definition of the relevant market and examination of market power."  Spectrum Sports, 506 U.S. at 456; accord Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112 (3d Cir. 1992) ("[A] dangerous probability of monopoly may exist where the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct." (quoting Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786, 790 (2d Cir. 1987))).  While "[d]emonstrating a

particular market share alone is not the only yardstick by which courts measure a dangerous probability of success, . . . courts have found that a demonstration of 35 % market share is sufficient to demonstrate a dangerous probability of success." Kellam Energy, Inc. v. Duncan, 668 F. Supp. 861, 891 (D. Del. 1987) (citing Outboard Marine Corp. v. Pezetel, 461 F. Supp. 404, 406 (D. Del. 1978)).

Without properly pleading the relevant market, the Court is unable to determine whether there is a dangerous probability of success. However, the Court addresses its concerns regarding the current allegations to guide Plaintiffs in a possible amendment of their complaint.

The following allegations in the Second Amended Complaint are relevant to this analysis:

> Defendant National Express and Defendant Berardi (through Blue Gentian, LLC, an entity on which Defendant Berardi is the sole member) have used the fraudulently obtained '941, '942, and '776 patents to restrain competition in part by suing Plaintiff Tristar Products and other competitors claiming infringement and threatening their customers. . . . Indeed, various New Jersey cases between Telebrands, Inc. and Blue Gentian, LLC over the fraudulently obtained patents have settled, which evinces an additional restraint on competition, as, upon information and belief, Telebrands, Inc. currently occupies over 70% of the relevant expandable and contractible hose marketshare. Defendant National Express and Blue Gentian, LLC have used the fraudulently obtained '941, '942, and '776 patents to fraudulently obtain international patents to further restrain competition internationally in part by suing Plaintiff Tristar Products and other competitors claiming infringement and threatening their customers in various

international jurisdictions.
       . . . . In addition, by purporting to license the
       fraudulently obtained patents to Telebrands, Inc.,
       Defendants have committed another anticompetitive act
       which, due to Telebrands, Inc. substantial position in
       the marketplace, carries a dangerous probability that
       Defendants will succeed in their attempt to achieve
       "monopoly power."

Plaintiffs argue in their opposition brief that the Second

Amended Complaint pleads that, "with the settlement announced by

Defendants, Defendants control in excess of 70% of the

marketplace, with additional lawsuits pending to control the

remaining market share.  Indeed, according to Defendants,

Telebrands claimed to occupy 90% of the marketplace, perhaps

securing a monopoly when added to Defendants' own market share."

In its reading of the Second Amended Complaint, the Court

finds no indication that Defendants control seventy percent of

the marketplace.  The Court fails to see how pleading

Telebrands' marketshare as seventy percent is equivalent with

pleading that Defendants' marketshare is seventy percent.  That

a settlement exists in a related patent infringement suit says

very little, if anything, about Defendants' market power and

resulting ability to injure competition.  Even with the

allegation that these cases with Telebrands have settled, this

alone does not tell us the effect such settlements had on

Defendants' marketshare.

This failure to sufficiently plead marketshare is

significant, but not necessarily fatal to the claim.

> In a determination of dangerous probability – and remembering that we are only considering "the face of the complaint" – factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand may be considered.

Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 318 (3d Cir. 2007). "No single factor is dispositive." Id. This is a "fact-sensitive inquiry, in which market share is simply one factor." Id. at 319.

The Court does not find the Second Amended Complaint sufficiently pleads these other factors. "Courts typically should not resolve this question at the pleading stage 'unless it is clear on the face of the complaint that the "dangerous probability" standard cannot be met as a matter of law.'" Id. at 318 (quoting Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 877 (3d Cir. 1995)). While the Court already finds this claim must be dismissed due to failure to sufficiently plead the relevant market, these additional concerns should be addressed in any amended complaint.[14]

---

[14]  The Southern District of Florida found Plaintiffs did not allege harm to competition sufficiently: "Here, Plaintiffs allege harm to themselves by having to defend against allegedly baseless infringement suits, but there are no factual allegations addressing how this conduct has harmed competition in the market or could lead to monopolization of the market." The Court further found Plaintiffs "failed to allege sufficient facts to demonstrate a dangerous probability that Defendants

## VII. Conclusion

In light of the Court's dismissal of the antitrust claim, the Court declines at this time to address the arguments for dismissal of the state law claims. Defendants will be granted leave to seek the dismissal of those claims in the event Plaintiffs adequately plead a federal claim.

In their opposition briefs, Plaintiffs request that, if the Court finds dismissal of any of the claims appropriate, that the Court grant leave to file an Amended Complaint.[15] The Court will grant that request.

Unless amending as a matter of course, Federal Rule of Civil Procedure 15 provides "a party may amend its pleading only with the opposing party's written consent or the court's leave," which the court should "freely give . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). The Third Circuit dictates that amendments should "be granted freely," stating a preference for decisions made "on the merits rather than on technicalities." Dole v. Arco Chem. Co., 921 F.2d 484, 486-87

---

might have succeeded in their attempt to achieve monopoly power."

[15] Alternatively, Plaintiffs request that the Court dismiss the cause of action without prejudice, arguing that "[t]he causes of action listed necessarily involve secrecy and intent to deceive, and therefore finding specific facts of such causes of action has proven difficult."

(3d Cir. 1990).

"[A] refusal of a motion for leave to amend must be justified.  Permissible justifications include: (1) undue delay; (2) bad faith or dilatory motive; (3) undue prejudice to the opposition; (4) repeated failures to correct deficiencies with previous amendments; and (5) futility of the amendment." Riley v. Taylor, 62 F.3d 86, 90 (3d Cir. 1995) (citation omitted).

The Court will grant Plaintiffs leave to amend to attempt to cure the pleading deficiencies identified above.  The Court does not find undue delay or bad faith by Plaintiffs.  The Court further does not find undue prejudice will befall Defendants in allowing another amendment.  While Plaintiffs have twice amended their complaint in this matter already, the first amendment was under Eleventh Circuit antitrust law, and the second amendment was for the purpose of pleading personal jurisdiction in New Jersey.[16]  The Court further does not find amendment futile. Plaintiffs will be granted leave to amend.[17]

---

[16]    This Court's conclusions differed from the Southern District of Florida's in many respects due to the different law being applied.  While the parties are expected to apply and understand how Third Circuit law applies to these facts, the unique procedural posture of this case could have left Plaintiffs unaware of the importance of re-pleading certain elements of their claims such that allowing leave to amend is appropriate.

[17]    In the event Plaintiffs refile their amended complaint with their state law claims and a similar motion to dismiss is filed, the parties are directed to brief the issues of Florida law's

An appropriate Order will be entered.


Date:  March 22, 2018               s/ Noel L. Hillman
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.

_____

treatment of a breach of contract claim concerning an oral
contract and whether, under Florida law, an implicit
representation based on a party's actions is sufficient for
common law fraud, as opposed to an explicit statement.

Additionally, the Court notes there is a split of authority
as to whether a Walker Process claim is a compulsory
counterclaim which must be pled in a patent infringement suit.
See Critical-Vac Filtration Corp. v. Minuteman Int'l Inc., 233
F.3d 697 (2d Cir. 2000) (compulsory counterclaim); FilmTec Corp.
v. Hydranautics, 67 F.3d 931 (Fed. Cir. 1995) (compulsory
counterclaim); Med. Mut. of Ohio, Inc. v. Braintree Labs., 2011
U.S. Dist. LEXIS 74996 (D. Del. July 12, 2011) (compulsory
counterclaim); Am. Packaging Corp. v. Golden Valley Microwave
Foods, 1995 U.S. Dist. LEXIS 5918 (E.D. Pa. Apr. 28, 1995)
(compulsory counterclaim) aff'd without opinion by 1996 U.S.
App. LEXIS 12061 (3d Cir. 1996).  But see Tank Insulation Int'l,
Inc. v. Insultherm, Inc., 104 F.3d 83 (5th Cir. 1997)
(permissive counterclaim); Hydranautics v. FilmTec Corp., 70
F.3d 533 (9th Cir. 1995) (permissive counterclaim).  The Court
need not resolve the split but observes that if, consistent with
the rulings of other districts within this Circuit, the Court
were to hold that the Walker Process claim is a compulsory
counterclaim, such holding would further support dismissal of
the claim.  If the complaint is amended, the parties are further
directed to brief this issue in any motions to dismiss that
might follow.