**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN DIVISION**

| | |
|---|---|
| **RAGNER TECHNOLOGY CORP. and** )<br>**TRISTAR PRODUCTS, INC.,** )<br>)<br>Plaintiffs, )<br>v. )<br>)<br>**MICHAEL BERARDI and** )<br>**NATIONAL EXPRESS, INC.** )<br>)<br>Defendants. )<br>)<br>) | **CIVIL ACTION FILE NUMBER:**<br><br>**1:15-CV-07752-NLH-AMD** |

## THIRD AMENDED COMPLAINT FOR ANTITRUST, BREACH OF CONTRACT, FRAUD, AND DEMAND FOR JURY TRIAL

Plaintiff Ragner Technology Corporation, a Delaware corporation (hereinafter "Ragner Technology") and Plaintiff Tristar Products, Inc., a Pennsylvania corporation (hereinafter "Tristar Products") (collectively "Plaintiffs"), by their undersigned attorneys, for their Third Amended Complaint ("Complaint") against Michael Berardi, a Florida resident (hereinafter "Mr. Berardi"), and National Express, Inc., a Connecticut corporation (hereinafter "National Express"), upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters, alleges as follows:

## THE PARTIES

1.      Plaintiff Ragner Technology is a Delaware corporation having its primary mailing address at 4344 NW 34th Dr., Gainesville, Florida 32605.

2.      Plaintiff Tristar Products is a Pennsylvania corporation having its corporate headquarters at 492 Route 46 East, Fairfield, New Jersey 07004.

3.      Upon information and belief, Defendant Mr. Berardi is an individual residing in the State of Florida, having a place of residence at 223 Skylark Point, Jupiter, Florida 33458.

4.      Upon information and belief, Defendant National Express is a Connecticut corporation having a principal place of business at 2 Morgan Avenue, Norwalk, Connecticut 06851.

## JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction over the action pursuant to 28 U.S.C §§ 1337 (commerce and antitrust regulation) and 1331 (federal question), as this is a civil action arising under Section 2 of the Sherman Act, 15 U.S.C. §2 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

6.      The Court has subject matter jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367, as those claims are related to and arise from the same set of facts as Plaintiffs' antitrust claims.

7-18.    (Reserved)

19.      Upon information and belief, personal jurisdiction is proper in this Court as to Defendant National Express because National Express consented to the transfer of this action to the United States District Court for the District of New Jersey.  (*See* Doc. 53).  In addition, National Express solicits business and conducts business within the State of New Jersey, including but not

limited to maintaining a website with access in New Jersey, marketing to customers in the State of New Jersey, and having commercial and residential sales in the State of New Jersey through its website and its authorized retailers.  Therefore, the Court has personal jurisdiction over National Express pursuant to N.J. Ct. R. 4:4-4 and 28 U.S.C. § 1404(a), and venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(c), and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

20.    Upon information and belief, Blue Gentian, LLC has granted Defendant National Express the exclusive right under Berardi U.S. Patent No. 8,291,941, Berardi U.S. Patent No. 8,291,942, Berardi U.S. Patent No. 8,479,776, Berardi U.S. Patent No. 8,757,213, Berardi U.S. Design Patent No. D722,681, and Berardi U.S. Design Patent No. D724,186 to at least market and sell an expandable hose product under the brand name "Xhose."  Upon information and belief, under the exclusive license both Blue Gentian, LLC and Defendant National Express have a right to litigate infringement cases with respect to Berardi U.S. Patent No. 8,291,941, Berardi U.S. Patent No. 8,291,942, Berardi U.S. Patent No. 8,479,776, Berardi U.S. Patent No. 8,757,213, Berardi U.S. Design Patent No. D722,681, and Berardi U.S. Design Patent No. D724,186.

21.    Upon information and belief, Defendant Michael Berardi (as the sole managing member of Blue Gentian, LLC) directs Blue Gentian, LLC to restrain competition in part in the State of New Jersey by suing competitors claiming infringement and threating their customers. These actions include at least *Blue Gentian, LLC v. Tristar Products.*, Civil Action No. 13-07099-FSH-JBC (D.N.J. 2013) and *Blue Gentian, LLC v. Telebrands Corp.*, Civil Action No. 13-00481-FSH-JBC (D.N.J. 2013).

22.    Upon information and belief, Defendant Mr. Berardi, with his wife, Cheryl Berardi, owns the video production company Berardi Productions, Inc.  Upon information and belief,

Berardi Productions, Inc. has an exclusive agreement to produce at least television and online advertisement for the Xhose product sold by Defendant National Express.  Mr. and Mrs. Berardi (the sole officers of Berardi Productions, Inc.) direct Berardi Productions, Inc. to produce anticompetitive Xhose TV commercials for Defendant National Express which air in the State of New Jersey.

23.    Upon information and belief, Mrs. Berardi and Defendant Mr. Berardi write, produce, direct, and edit the anticompetitive Xhose TV commercials which air in the State of New Jersey.  Defendant Mr. Berardi can be seen in at least one commercial.

24.    On or about May 2014, Defendant Michael Berardi met with Keith Mirchandani, the executive officer and president of Plaintiff Tristar Products at Mr. Mirchandani's home in the State of New Jersey.  Defendant Michael Berardi and Mr. Mirchandani discussed various business matters, including at least the potential resolution of patent matters related to Berardi U.S. Patent No. 8,291,941, Berardi U.S. Patent No. 8,291,942, and Berardi U.S. Patent No. 8,479,776.

25.    (Reserved)

26.    Upon information and belief, personal jurisdiction is proper in this Court as to Defendant Michael Berardi, because Michael Berardi solicits business and conducts business within the State of New Jersey, including but not limited to directing (through Blue Gentian, LLC an entity of which Defendant Berardi is the sole member) restrain of competition in part in the State of New Jersey by suing competitors claiming infringement and threating their customers of fraudulently obtained Berardi U.S. Patent No. 8,291,941, Berardi U.S. Patent No. 8,291,942, Berardi U.S. Patent No. 8,479,776, Berardi U.S. Patent No. 8,757,213, Berardi U.S. Design Patent No. D722,681, and Berardi U.S. Design Patent No. D724,186 and directing anticompetitive marketing to competitors and customers in the State of New Jersey.  Therefore, the Court has

personal jurisdiction over Defendant Michael Berardi pursuant to N.J. Ct. R. 4:4-4 and venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(c), and as provided in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

27.     (Reserved)

## BACKGROUND

28.     On September 25, 2005, U.S. Patent No. 6,948,527 ("the '527 patent") entitled "Pressure-Actuated Linearly Retractable and Extendible Hose" duly and legally issued to Gary Dean Ragner and Robert Daniel deRochemont, Jr.  Ragner Technology is the owner and assignee of all right, title, and interest in and to the '527 patent, subject only to an exclusive license to Tristar Products.  Tristar Products has an exclusive license to make, have made, use, distribute, sell, offer for sale, and import in the United States certain products covered by the '527 patent.  Together, Ragner Technology and Tristar Products own all substantial rights in the '527 patent.  A true and correct copy of the '527 patent is attached hereto as Exhibit A.

29.     On June 23, 2009, U.S. Patent No. 7,549,448 ("the '448 patent") entitled "Linearly Retractable Pressure Hose" duly and legally issued to Gary Dean Ragner.  Ragner Technology is the owner and assignee of all right, title, and interest in and to the '448 patent, subject only to an exclusive license to Tristar Products.  Tristar Products has an exclusive license to make, have made, use, distribute, sell, offer for sale, and import in the United States certain products covered by the '448 patent.  Together, Ragner Technology and Tristar Products own all substantial rights in the '448 patent.  A true and correct copy of the '448 patent is attached hereto as Exhibit B.

30.     In or about May 2011, Plaintiff Ragner Technology was introduced to Greg Janson (hereinafter "Janson") through a business broker named Vince Simonelli (hereinafter "Simonelli").  Simonelli portrayed Janson as interested in investing in Ragner Technology or bringing Ragner

Technology to the attention of potential investors.  Ragner Technology hired Janson as a broker to recruit potential investors in Ragner Technology's patented products.  Janson signed a non-disclosure agreement with Ragner Technology on or about May 12, 2011.

31.     On August 9, 2011, Janson contacted Plaintiff Ragner Technology requesting a copy of its business plan to distribute to potential investors.  In response to Janson's request, and in reliance of the terms of the executed non-disclosure agreement, Ragner Technology provided a business plan to Janson without any technical specifications of the product then under development.

32.     Upon information and belief, Janson informed Defendants that Plaintiff Ragner Technology was seeking to meet strictly with investors and not potential licensees of the patented technology.

33.     On August 15, 2011, Margaret Combs, CEO of Ragner Technology, was copied on an e-mail correspondence between Janson and Defendant Mr. Berardi.  The e-mail contained a copy of Ragner Technology's business plan and instructions for accessing Ragner Technology's password protected website for their expandable retractable hose products (the "Microhose product").  The password protected website demonstrated the various features and benefits of the Microhose.  The email further detailed the amount that Ragner Technology was seeking as investment in its expandable hose product.

34.     In or about the week of August 15, 2011, Janson called Ragner Technology to set up a meeting between Ragner Technology and potential investors in Jupiter, Florida.  A meeting was established for the morning of August 23, 2011.  Ragner Technology was given an address of 223 Skylark Point in Jupiter, Florida for the meeting.  Janson also informed Ragner Technology that a gentleman was flying in from Connecticut for the meeting.  Email correspondence makes

clear that Defendant Mr. Berardi received a copy of the Microhose Business Plan and that Ragner Technology was seeking $3 million as an investment in its patented technology.

35.     On August 23, 2011, representatives of Ragner Technology comprising Gary Ragner, Robert deRochemont, Jr., and Margaret Combs arrived at 223 Skylark Point in Jupiter, Florida for the scheduled meeting, and for the first time learned that it was the home of Defendant Mr. Berardi and Mrs. Berardi when Defendant Mr. Berardi opened the door and introduced himself and Mrs. Berardi.  At the meeting Ragner Technology was introduced to and for the first time learned that the Connecticut gentleman was Edward Kelly (hereinafter "Mr. Kelly"), CEO of Defendant National Express.  Defendant Mr. Berardi and Mrs. Berardi were introduced to Ragner Technology as Mr. Kelly's producers for his television commercials.  Simonelli and Janson were also present at the meeting.

36.     Following pleasantries, Mr. Kelly requested clarification regarding the scope of the meeting, and Plaintiff Ragner Technology again stated it was seeking investors and not licensing opportunities for its patented technology.  Prior to disclosing any confidential information, Margaret Combs informed Defendant Mr. Berardi, Mrs. Berardi and Mr. Kelly that non-disclosure agreements had not been prepared for Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, or Mr. Kelly, because Ragner Technology had been unaware with whom they were meeting.  Nevertheless, because confidential information was involved, Ms. Combs insisted that the meeting could not be conducted without agreement to terms of non-disclosure.  For the purposes of the meeting, Plaintiff Ragner Technology and Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly verbally agreed to terms of confidentiality and non-disclosure for the purposes of the meeting and Defendant Mr. Berardi, Mrs. Berardi, Defendant

National Express, and Mr. Kelly agreed to execute a written non-disclosure agreement to be sent by Ms. Combs following the meeting.

37.     Upon assurances by Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly that the information disclosed by Ragner Technology during the meeting was in accordance with the terms of the verbal non-disclosure agreement, Ragner Technology disclosed information relating to Ragner Technology, the scope of its patents, product specifications, and target market of the Microhose product.  The material and false representations and omissions of confidentiality and non-disclosure made by Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express and Mr. Kelly, were intended to induce and did induce reliance by Ragner Technology to disclose confidential information during its presentation, including specific engineering diagrams, ideas, materials of manufacture, including but not limited to, prior iterations of prototype hoses and prototype hoses constructed of more than one layer, more than one material, at least one fabric layer, various materials of manufacture including, but not limited to, vinyl, nylon, rubber, polyester, and/or polypropylene, at least one layer with cord reinforcement including a hose wherein the biasing was performed by elastic material such as polymers made of thermoplastic polyurethane to provide retracting force, manufacture know-how, concepts, etc. related to its prototypes of the Microhose product.

38.     Plaintiff Ragner Technology again articulated its request for a financial investor and Defendant National Express quickly expressed that it was interested in only licensing the patented technology -- it intended the product be manufactured in Taiwan.  Ragner Technology informed Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly of its hesitancy to use a foreign manufacturer, due to prior experience with non-U.S. manufacturing.  Mr. Kelly made assurances to Ragner Technology that he and/or National Express had an excellent

8

contact in Taiwan who was capable of manufacturing a hose in accordance with the specification of the patented technology.   Mr. Kelly requested, subject to the terms of the non-disclosure agreement, permission to contact his manufacturer in Taiwan to address the ability of the manufacturer to produce a product in accordance with the patented technology.   Ragner Technology informed Mr. Kelly and Defendant National Express that limited disclosure for this limited purpose was authorized and in accordance with the parties goals and therefore such disclosure was permissible, subject to all other terms of the non-disclosure agreement.  Mr. Kelly agreed and indicated that he would contact the manufacturer and would inform Ragner Technology regarding his discussion(s) with the Taiwanese manufacturer.

39.     After lunch Defendant Mr. Berardi was anxious to see a prototype or prototypes of the Microhose product.  Ragner Technology demonstrated one of the patented prototypes of the Microhose product in its possession to Defendant Mr. Berardi, Defendant National Express, and Mr. Kelly by connecting the prototype to Defendant Mr. Berardi and Mrs. Berardi's faucet located in a side yard.  Before all the parties present, Defendant Mr. Berardi used the patented prototypes and saw it expand while walking around the side yard and retract when the water was turned off.

40.     Mr. Kelly left immediately after Ragner Technology's disclosure of confidential information to go to the airport.  Ragner Technology collected the patented prototypes and left Defendant Berardi's house at or about 2:00 PM EST.

41.     On the following morning (August 24, 2011), Margaret Combs, as CEO of Ragner Technology, prepared non-disclosure agreements for Defendants Berardi, National Express, and Mr. Kelly.  The non-disclosure agreements were dated for August 23, 2011, reflecting the date that Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly verbally agreed to the terms of the confidentiality and non-disclosure agreement.  The non-disclosure agreements

were sent to Defendant Mr. Berardi and an e-mail address on the business card provided by Defendant National Express.

42.     Despite assurances by Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly that (1) the disclosure made by Ragner Technology on August 23, 2011 would be protected as confidential, and (2) that each would execute the non-disclosure following the meeting, Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, nor Mr. Kelly never executed the non-disclosure agreement.

43.     Plaintiff Ragner Technology would not have disclosed confidential information to Defendants without Defendants' agreement to the terms of its non-disclosure agreement.   In disclosing the confidential information to Defendants, Plaintiff Ragner Technology relied on Defendants' agreement to the verbal non-disclosure provision and further relied on Defendants' assertion that each would formally execute a written non-disclosure agreement.

44.     Despite assurances by Mr. Kelly, Plaintiff Ragner Technology was not contacted by Defendant National Express about Mr. Kelly's communications with his Taiwanese manufacturer.

45.     Plaintiff Ragner Technology would not have agreed to meet with Defendants if Defendants had not misrepresented their intentions with respect to investment in Plaintiff Ragner Technology.   But for Defendants' apparent interest in investing in Plaintiff's expandable hose products, Plaintiff Ragner Technology would neither have met with Defendants, nor disclosed any confidential information to Defendants.

46.     On November 4, 2011, Defendant Mr. Berardi filed a patent application titled "Expandable and contractible hose" that purported to claim novel features of the prototypes of the Microhose product demonstrated by Ragner Technology at the August 23, 2011 meeting.

47.     With the assistance of Mrs. Berardi, Defendant Mr. Berardi fraudulently obtained patents from the United States Patent and Trademark Office ("USPTO"), including but not limited to U.S. Patent No. 8,291,941 ("the '941 patent") entitled "Expandable and contractible hose," U.S. Patent No. 8,291,942 ("the '942 patent") entitled "Expandable hose assembly," U.S. Patent No. 8,479,776 ("the '776 patent") entitled "Expandable garden hose," U.S. Patent No. 8,757,213 ("the '213 patent") entitled "Commercial hose," U.S. Design Patent No. D722,681 ("the '681 patent") entitled "Expandable Hose," and U.S. Design Patent No. D724,186 ("the '186 patent") entitled "Expandable Hose Assembly."  In so doing Defendant Mr. Berardi deliberately failed to disclose material information—including proper identification of inventorship and key prior art—at times when it was known to Defendant Mr. Berardi and Mrs. Berardi that claimed features were from the prototypes presented by Ragner Technology at the August 23, 2011 meeting and Defendant Mr. Berardi had a duty to disclose that prior art and inventorship to the USPTO.  As one example of Defendants' misrepresentations and omission, Defendant Mr. Berardi filed an Oath and Declaration with the United States Patent and Trademark Office on November 4, 2011 representing that he was the inventor of the expandable and retractable hose that is the subject of the '941 patent, despite knowing that Mr. Ragner was the inventor of the subject of the '941 patent. Similarly, Defendant Mr. Berardi filed an Oath and Declaration with the United States Patent and Trademark Office on June 6, 2012 representing that he was the inventor of the expandable and retractable hose that is the subject of the '942 patent, despite knowing that Mr. Ragner was the inventor of the subject of the '942 patent.  But for these material misrepresentations regarding the true inventor of the claimed expandable and contractable hose -- information that was known by Defendant Mr. Berardi and obtained during the August 23, 2011 meeting under terms of non-disclosure -- the examiner would have maintained his rejection and the '941 and '942 patents

Case 1:15-cv-07752-NLH-AMD   Document 137   Filed 04/21/18   Page 12 of 30 PageID: 2734

would not have issued.  A true and correct copy of the '941 patent is attached hereto as Exhibit C.  A true and correct copy of the '942 patent is attached hereto as Exhibit D.  A true and correct copy of the '776 patent is attached hereto as Exhibit E.  A true and correct copy of the '213 patent is attached hereto as Exhibit K.  A true and correct copy of the '681 patent is attached hereto as Exhibit L.  A true and correct copy of the '186 patent is attached hereto as Exhibit M.

48.     Furthermore, Defendant Mr. Berardi made representations to the USPTO that were material to the patentability in his then pending patent claims which he knew to be false.  The material and false representations and omissions were intended to induce and did induce reliance by the patent examiners charged with determining whether to grant Defendant Mr. Berardi's patent claims.  On August 3, 2012, the USPTO issued an Office Action in connection with the application which ultimately issued as the '941 patent, and on August 2, 2012, the United States Patent and Trademark Office issued an Office Action in connection with the application which ultimately issued as the '942 patent.  The Office Actions demonstrate that the patent examiner (1) rejected a subset of pending claims as anticipated by the '527 patent, (2) rejected various subsets of pending claims as obvious in light of the '527 patent, and (3) rejected various subsets of pending claims as obvious in light of a combination of the '527 patent and other references.  On August 15, 2012, Defendant Mr. Berardi, during an in-person conference, "presented a video showing how Mr. Berardi initially manufactured the hose" without informing the examiner that he obtained such information from Mr. Ragner regarding creation of the hose under terms of non-disclosure.  Defendant Mr. Berardi further "pointed [to] differences between the [pending claims] and the Ragner et al. reference, mainly the fact that the inner and outer layers of the Ragner et al. hose are bonded together and that the outer layer is plastic material, wherein the [pending claims'] outer layer is formed of a fabric material."  Defendant Mr. Berardi failed to inform the patent examiner

12

that Mr. Ragner explained, under terms of non-disclosure, that the outer cover of the '527 invention could include a fabric cover, and that the inner and outer layer need not be bonded.  But for these material misrepresentations regarding the scope of the invention disclosed in the '527 patent -- information that was known by Defendant Mr. Berardi and obtained during the August 23, 2011 meeting under terms of non-disclosure -- the examiner would have maintained his rejection and the '941 and '942 patents would not have issued.

49.    As reflected in the prosecution history of the '941, '942, '776, '213, '681, and '186 patents, Defendant Mr. Berardi failed to mention the prototypes presented by Ragner Technology at the August 23, 2011 meeting or correct inventorship for claimed features which Defendant Mr. Berardi did not conceive.  The USPTO relied on Defendant Mr. Berardi's material false statements and omissions as a principal reason for allowing Defendant Mr. Berardi's patent claims to issue. But for Defendant Mr. Berardi's material false statements and omissions, the claims of the '941, '942, '776,'213, '681, and '186 patents could not have issued as written.

50.    Upon information and belief, Blue Gentian, LLC, is the owner of all right, title, and interests in the '941, '942, '776, '213, '681, and '186 patents fraudulently obtained by Defendant Mr. Berardi.  Defendant Mr. Berardi is a managing member of Blue Gentian, LLC and as such Blue Gentian, LLC knew that the '941, '942, '776, '213, '681, and '186 patents were fraudulently obtained.

51.    Upon information and belief, Blue Gentian, LLC has granted Defendant National Express the exclusive right under the '941, '942, '776, '213, '681, and '186 patents to at least market and sell an expandable hose product under the brand name "Xhose."  Defendant National Express knew that the '941, '942, '776, '213, '681, and '186 patents were fraudulently obtained since Mr. Kelly acting on behalf of Defendant National Express was present at the August 23,

2011 meeting where Ragner Technology disclosed features that are now fraudulently claimed in the '941, '942, '776, '213, '681, and '186 patents.

52.     Tristar Products is a developer, manufacturer, and marketer of various consumer products including, but not limited to, home appliances, fitness equipment, health and beauty articles, and hardware.

52A.   On July 15, 2014, U.S. Patent No. 8,776,836 ("the '836 patent") entitled "Linearly Retractable Pressure Hose Structure" duly and legally issued to Gary Dean Ragner.   Ragner Technology is the owner and assignee of all right, title, and interest in and to the '836 patent, subject only to an exclusive license to Tristar Products.   Tristar Products has an exclusive license to make, have made, use, distribute, sell, offer for sale, and import in the United States certain products covered by the '836 patent.   Together, Ragner Technology and Tristar Products own all substantial rights in the '836 patent.

53.     Among the products sold by Tristar Products is the FLEX-ABLE HOSE® product. Tristar Products' activities with respect to the FLEX-ABLE HOSE® product is a direct result of Tristar Products' exclusive license granted from Ragner Technology to make, have made, use, distribute, sell, offer for sale, and import in the United States certain products covered by the '527 patent, the '448 patent, and the '836 patent.   Tristar Products' act of making, having made, using, distributing, selling, offering for sale, and/or importing in the United States certain products covered by the '527 patent, the '448 patent, and the '836 patent  are wholly based on its reliance that the '527 patent, the '448 patent, and the '836 patent are valid.

54.     The FLEX-ABLE HOSE® product competes directly with Defendant National Express' expandable hose product under the brand name "Xhose," and with Telebrands Corp.'s expandable hose product "PocketHose."

55.     Defendant National Express and Defendant Mr. Berardi (through Blue Gentian, LLC, an entity of which Defendant Mr. Berardi is the sole member) have used the fraudulently obtained '941, '942, '776, '213, '681, and '186 patents to restrain competition in part by suing Plaintiff Tristar Products and other competitors claiming infringement and threatening their customers.  For example, civil action *Blue Gentian, LLC v. Tristar Products*, No. 13-07099-FSH-JBC (D.N.J. 2013), now No. 13-cv-1758-NLH-AMD ("the '1758 infringement action"), is currently pending before this Court.  And Defendant Mr. Berardi announced in an interview published on YouTube that he intends to vigorously enforce the fraudulently-obtained patents. *See* Defendant Mr. Berardi's interview with Reg Miller (07:55-08:44), available at http://youtube.com/watch?v=aNVOw2__Esw ("The minute we got our patent . . . we filed a patent infringement suit" against infringers and "against some of the largest retailers").  Blue Gentian, LLC and Defendant National Express have further conspired with Telebrands Corp.—which currently occupies over 70% of the relevant expandable and contractible hose market—to restrain competition using the fraudulently obtained '941, '942, '776, '213, '681, and '186 patents Although Telebrands Corp. was at one time itself sued for infringement by Blue Gentian, LLC and Defendant National Express, the parties not only settled that lawsuit but, upon information and belief, entered into an asset purchase agreement in which Telebrands Corp. purchased all rights, title, and interest in those patents from Defendant National Express.  Iyer Decl., ¶¶6–10 (Exhibit G).  Upon information and belief, Telebrands Corp. purchased the rights to these patents knowing full well that they were fraudulently obtained and has joined the '1758 infringement action as a plaintiff in an effort to exploit its dominant market share to suppress competition.  Although, upon information and belief, Telebrands Corp.'s purchase of Defendant National Express's rights, title, and interest in the '941, '942, '776, '213, '681, and '186 patents occurred after the present action

was filed, where a defendants' market share rises substantially during the course of the challenged behavior, the later higher number is the one most relevant for determining the existence of a dangerous probability of success.

56.     A patent, by its nature, creates an environment of exclusion and consequently cripples competition.   When patents are fraudulently obtained, the anticompetitive effect is necessarily present due to the exclusionary nature of the patents.  In addition, by agreeing to the conveyance of exclusive rights in the fraudulently obtained patents to Telebrands Corp., Defendants have committed another anticompetitive act which, due to Telebrands Corp.'s substantial position in the marketplace, carries a dangerous probability that Defendants will succeed in their attempt to achieve "monopoly power."

57.     Defendants have disseminated information into the marketplace that further evinces the anticompetitive nature of the fraudulently obtained patents.   First, Defendants have spent considerable sums of money filming and displaying commercials in the public domain which attempt to utilize the fraudulent patents.  These commercials are a clear attempt to convince the consuming public that Defendants' patents signify that their product is the only expanding hose on the market – that if the public buys any other expandable hose it will "be fooled by imitations." As an example, one of Defendants' commercials states "Hi, I'm Michael Berardi.  I'm the inventor of the X-Hose, the original blue expanding hose.  In fact, I've been awarded two U.S. patents for my invention.  My X-Hose is the only patented expanding hose on the market and it bears the trusted DAP products name."  This is despite Defendants' knowledge that the '527 patent covers an expanding hose, and that Defendant Mr. Berardi is not the original inventor of expandable and contractable hoses.  A later commercial states "In fact, I invented it in my own backyard.  I've been awarded 7 US patents and many international patents for my invention, and still, it's one of

the most imitated inventions ever!  So don't get all wrapped up like me with the imitators" while showing an image of Defendant Mr. Berardi wrapped in what are identified to consumers to be competitor's "imitation" hoses.  This commercial goes so far as to plead "and if you believe that a person's hard work, ideas and dreams should be rewarded and not copied, then please buy my new DAP XHose Pro Extreme!"  In addition, in January of 2015, Defendant Mr. Berardi was the subject of a cover story for Inventors Digest in which he appears on the cover which exclaims that Defendant Mr. Berardi was "HOSED!" by competition and wrapped in what is identified as "IMITATIONS!"  (Exhibit F).  Inside the magazine, an article details (1) that Defendant Mr. Berardi had no inventing experience prior to meeting with Mr. Ragner, (2) that Defendant Mr. Berardi began experimenting with expandable hoses around the time of the meeting with Ragner, (3) that Defendant Mr. Berardi has no notes or drawings that would establish his inventorship, only videos which occurred after the meeting with Ragner, (4) that Defendant Mr. Berardi applied for patents in an attempt to "protect" his invention, (5) that Defendant Mr. Berardi and Mrs. Berardi created the anticompetitive commercial materials "soup to nuts" and that Defendant Mr. Berardi and Mrs. Berardi were a team throughout the development and sale of the Xhose product, and (6) that Defendants have attempted to eliminate competition by filing lawsuits against entities they feel infringe the fraudulently obtained patents.  Interestingly, Defendant Mr. Berardi admits that an inventor "may be surprised to learn that someone else has already thought of your idea or your invention" but fails to discuss the misrepresentations to the USPTO in order to fraudulently obtain patents.  Defendants have, continue, and will continue to disseminate such information in order to stifle competition in the marketplace.

58.     Tristar Products has been injured and damaged by Defendant Mr. Berardi (through Blue Gentian, LLC, an entity of which Defendant Mr. Berardi is the sole member), and Defendant

National Express's filing Complaints asserting infringement of fraudulent patent claims, in which litigation Telebrands Corp. has been joined.

59.     Ragner Technology has been injured and damaged by Defendant Mr. Berardi (through Blue Gentian, LLC, an entity of which Defendant Mr. Berardi is the sole member), and Defendant National Express's filing Complaints asserting infringement of fraudulent patent claims, in which litigation Telebrands Corp. has been joined.

## COUNT I
## CONSPIRARY TO MONOPOLIZE
### (in the alternative, ATTEMPT TO MONOPOLIZE)

60.     Plaintiffs reallege and incorporate the allegations set forth in Paragraph 1 through Paragraph 59 herein.

61.     Defendants have conspired to monopolize the expandable hose market. Expandable garden hoses generally differ from ordinary hoses in terms of their (1) physical characteristics including weight and size; (2) advertising and sales channels; and (3) consumer perception.  First, in terms of physical product characteristics, expandable hoses have only a fraction of the weight and size of most ordinary garden hoses, making them more convenient to use and store.  For example, upon information and belief, for a 50 feet long hose, expandable garden hoses generally weigh less than two pounds whereas ordinary garden hoses typically weigh more than six pounds.  Upon information and belief, the "heavy-duty" versions of non-retractable hoses can even weigh on the order of 12 pounds—six times the weight of a typical expandable hose of the same length.  Similarly, in addition to weight, upon information and belief, there is typically a noticeable difference in size.  This size difference is illustrated by Defendants' own claims in publications and advertisements.  For example, an article by Defendant Mr. Berardi in *Inventors Digest*, attached as Exhibit F, states that expandable garden hoses "solve[] the age-old

18

problems with traditional garden hoses that are heavy, always kinking, and difficult to store" because expandable hoses are "super lightweight, will never kink and store[] easily in small spaces." Telebrands Corp.'s commercials for its PocketHose product similarly state, "Say goodbye to those old-fashioned giant hoses that become a twisted tangled mess. Pick a Pocket Hose—it's small enough to fit in the palm of your hands." PocketHose commercial (00:18-00:28) (*see* screenshot in Exhibit H). And the commercial touts the small size of expandable hoses as making them "ideal" for use in boats and RVs—claiming that "two pocket hoses take up less space than a paint can." PocketHose commercial (1:25-1:32) (*see* screenshot in Exhibit H). Upon information and belief, in view of this noticeable difference in terms of size and weight, consumers desiring to purchase an expandable hose would not consider regular (non-expandable) garden hoses with substantially higher weight and size to fall within the same product category.[1] And as a result, upon information and belief, demand for ordinary garden hoses of typical weight will not vary with the change of prices in expandable hoses so as to establish a low cross-elasticity of demand between these two product categories.

61A. Second, expandable hoses differ from ordinary hoses because expandable hoses are promoted differently. Whereas ordinary hoses are primarily sold in brick-and-mortar stores and considered undifferentiated commodity products, expandable hoses are heavily promoted for their specific features—both online and through direct-response TV advertising. Indeed, Defendant Mr. Berardi explains in his article in *Inventors Digest* that expandable hoses meet the key "factors . . .

---

[1] Upon information and belief, there is a relatively small number of regular (non-expandable) hoses that have a significantly lower weight than this typical weight for regular-style hoses (including a weight similar to that of expandable hoses) and because demand for these lighter regular hoses may vary with the change of prices in expandable hoses, these lightweight non-expandable hoses may be a part of the expandable hose product market. However, upon information and belief, such hoses would constitute only a relatively small portion of such market.

inherent in a highly successful DRTV [Direct Response TV] product": (1) the product "[c]an be easily demonstrated on TV—When people saw my . . . expanding and contracting hose demonstrated for the first time[,] every one of them had the same reaction: 'OMG! That is sooooo cool! I want one!  Where can I get it?'"; and (2) the product "solves a problem"; here "handling heavy, dirty, kinking garden hoses was always a problem" and expanding hoses solve that problem because they are "super lightweight," "weigh[] only about 1 pound . . . and could be stored in a flower pot.  Problem solved!"  Defendants' own advertising and promotional materials illustrate that the specific characteristics and uses of expandable hoses have appeal to a distinct customer base, which, upon information and belief, leads to a distinct pricing structure and consumer demand that is not sensitive to price changes of expandable hose products.

61B.    Third, there is direct evidence that consumers perceive expandable hoses as a separate product category.  For example, a June 7, 2013 report by the magazine *Consumer Reports* (attached as Exhibit I), limits its tests and comparisons to expandable hoses and characterizes them as "flexible garden hoses"—separate and apart from ordinary hoses.   Indeed, the *Consumer Reports* test included only the three types of hoses at issue in this litigation: the PocketHose (sold by Telebrands Corp.), the DAP XHose (sold by National Express), and the FlexAbleHose (sold by Tristar Products).   Similarly, an industry study performed by the *Freedonia* market research group classifies "ordinary hoses" and "expandable hoses" as separate product categories and finds that "[l]ightweight expandable garden hoses are relatively new to the market—with most introduced since 2012—and they work differently from traditional hoses.  They are small and light when not in use and then expand about three times their original size when water flows through them."  *See* Freedonia Group, *Lawn & Garden Watering Market in the U.S.*, at 27-28 (Oct. 2017).  The industry

report further predicts increased demand for expandable hoses fueled by "ongoing consumer interest in task-specific hoses that are easy to manage, particularly for small jobs." *Id.*

62.     Defendants' conduct evinces specific intent to monopolize by knowingly and willfully omitting and misrepresenting facts in contradiction of the terms of confidentiality and non-disclosure, in connection with the filing and prosecution of the patent applications which ultimately issued as the '941, '942, '776, '213, '681, and '186 patents, and in asserting and conveying rights in these fraudulently-obtained patents.

63.     The definition of the geographic market reflects the market area in which the Defendants operate and to which consumers can practicably turn for supplies.  On information and belief, Defendants are engaged in interstate commerce in the United States, and the vast majority of their past, present, and future sales in the relevant market has and will occur in such commerce. Similarly, from a consumer perspective, the relevant geographic market is, upon information belief, of nationwide scope.  On information and belief, consumers order hoses by phone or online in response to direct-to-consumer advertising or other forms of advertising.  On information and belief, consumers all around the country can thus purchase Defendants' products and, due to substantially uniform shipment and transportation costs, receive expandable hoses through the mail or private courier services.

63A.    Expandable hoses are also sold through large national retailers, such as Walmart or Home Depot.  The stores of such large retail chains are reasonably accessible to consumers across the country, and, on information and belief, retail chains that carry expandable hoses, sell them nationwide.  Consumers throughout the nation can therefore practicably turn to these retailers to purchase expandable hoses, and the sellers of expandable hoses to these retail chains thus compete on a nationwide basis for consumers through the outlets of these big retailers.

63B.    Upon information and belief, the definition of the geographic market should not extend beyond the United States because (1) foreign manufacturers of expandable hoses generally do not sell to U.S. customers; (2) the fraudulently-obtained '941, '942, '776, '213, '681, and '186 patents present a high barrier of entry to the U.S. market; (3) Defendants have, on information and belief, entered into exclusive contracts that insulate the U.S. market.  Upon information and belief, the '941, '942,'776, '213, '681, and '186 patents are owned by Blue Gentian, LLC, which has licensed them, on an exclusive basis, to Defendant National Express—and, on information and belief, Defendant National Express recently transferred its title, rights, and interests in such license to Telebrands Corp. through an Asset Purchase Agreement.  Telebrands Corp.'s resulting exclusive rights to the fraudulently-obtained patents present a high-barrier to entry to the U.S. market because they subject sellers to potential infringement liability, and Defendants have sought to aggressively enforce these fraudulently-obtained patents in an attempt to monopolize the market.

63C.    Foreign litigation supports Plaintiffs' belief that Blue Gentian, LLC and Defendant National Express have entered into license agreements that divide up the U.S. and foreign markets.  Upon information and belief, Blue Gentian, LLC owns international patents directed to substantially similar expandable hoses in at least Canada, Australia, and some European countries.  However, on information and belief, unlike Blue Gentian, LLC's U.S. patents, the international patents are not licensed to Defendant National Express or Telebrands Corp. but to E. Mishan and Sons, Inc., a company that does business under the name "Emson."  *See, e.g.*, Exhibit J (noting that Emson is "the sole authorized distributor" in Canada).  On information and belief, Emson, and possibly other licensees outside the United States, do not sell expandable hoses to U.S. customers by virtue of their contractual arrangements, thereby limiting the relevant geographic market to the United States.

22

64.     Defendants' conspiratorial conduct, including fraudulently obtaining confidential information from Plaintiff Ragner Technology, utilization of the fraudulently obtained information to file for patent applications, misrepresenting true inventorship, misrepresenting the scope of the '527 patent, and assertion and conveyance of the fraudulently-obtained patents was a deliberate and conscious strategy to obtain a monopoly over expandable hoses.

65.     As a direct and proximate result of Defendants' unlawful concerted conduct, competition in the relevant market has been severely harmed through reduced competition, quality, innovation, and consumer choice to the detriment of consumers as described in detail above. Defendants' conduct, licensing activities, and market share demonstrate that the requisite "dangerous probability of success" is present.  For example, in his article in *Inventors Digest*, Defendant Mr. Berardi admits that his expandable hose was a "phenomenal success," that he sold "tens of thousands" of units in the first few months after airing his TV commercials in March 2012, and that "[a]ll of the major retailers were . . . wanting to sell the Xhose in their retail stores." Defendant Mr. Berardi's article also reveals that Defendants, without hesitation, relied on the fraudulently obtained '941, '942,'776, '213, '681, and '186 patents to erect barriers of entry into the expandable hose market and to stifle competition by Tristar Products and then-competitor Telebrands Corp.  For example, Defendants filed infringement lawsuits against Tristar Products and then-competitor Telebrands Corp. on the same day the fraudulently-obtained patent issued. Telebrands Corp. has since been joined as a plaintiff in litigation asserting the fraudulently-obtained patents.

65A.   The dangerous probability of success associated with Defendants' conduct is confirmed by Defendants' rising market share because, where a defendants' market share rises substantially during the course of the challenged behavior, the later number is the one most relevant

for determining the existence of a dangerous probability of success.  As noted above, Blue Gentian, LLC and Defendant National Express not only settled their infringement suit with Telebrands Corp., but, on information and belief, Defendant National Express also recently transferred to Telebrands Corp. its title, rights, and interests in such license to, *inter alia*, the '941, '942,'776, '213, '681, and '186 patents knowing full well that the patents were fraudulently-obtained. Because Blue Gentian, LLC, Defendant National Express, and Telebrands Corp. have joined forces in their attempt to monopolize the expandable hose market, it is the combined market share of the three parties that is relevant in the analysis of whether a dangerous probability exits.  Indeed, based on assertions by Defendant National Express, Telebrands Corp.'s market share alone exceeds 70 percent of the market and by itself easily supports the finding of such a dangerous probability.

66.     As a direct and proximate result of Defendants' unlawful conduct, the Plaintiffs have been injured.

## COUNT II
## COMMON LAW FRAUD

67.     Plaintiffs reallege and incorporate the allegations set forth in Paragraph 1 through Paragraph 66 herein.

68.     Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly made material misrepresentations to induce Plaintiff Ragner Technology to disclose confidential information regarding their patented prototype Microhose product.

69.     Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly, having received confidential information relating to Plaintiff Ragner Technology's patented expandable hose, further deceived Plaintiff Ragner Technology by filing patent applications claiming features of the product disclosed by Plaintiff Ragner Technology with full knowledge

that Plaintiff Ragner Technology, and competition in the marketplace would be harmed by its filing of the patent applications.

70.     Plaintiff Ragner Technology relied on Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly's material misrepresentations in licensing discussions pertaining to its patented expandable hose product with additional investors and/or product manufacturers, including its licensing discussions with Plaintiff Tristar Products.

71.     Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly knew or should have known that the statements were false at the time they were made.

72.     Plaintiff Ragner Technology reasonably relied upon Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly's misrepresentations.

73.     As a direct and proximate result of Defendants' misrepresentations, Plaintiff Ragner Technology has been injured.

## COUNT III
## BREACH OF CONTRACT

74.     Plaintiffs reallege and incorporate the allegations set forth in Paragraph 1 through Paragraph 73 herein.

75.     Plaintiff Ragner Technology and Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly entered into an oral non-disclosure agreement on August 23, 2011.  Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly agreed to formally execute a written confirmation of the oral non-disclosure agreement.  Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly willfully refused to execute the written confirmation of the oral non-disclosure agreement.

76.     Pursuant to the non-disclosure agreement Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly agreed to not use any information learned from the

meeting to the detriment of Plaintiff Ragner Technology by disclosing the confidential information learned to a third party.

77.     Plaintiff Ragner Technology disclosed confidential information regarding its expandable hose products, including materials, testing, prototypes, and general know-how, subject to the terms of the non-disclosure agreement.

78.     Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly used the confidential information disclosed in the August 23, 2011 meeting to file patent applications that claimed features disclosed at the meeting.  Defendant Mr. Berardi, Mrs. Berardi, Defendant National Express, and Mr. Kelly breached the non-disclosure agreement by at least disclosing the information to the USPTO in breach of its covenants under the non-disclosure agreement.

79.     As a direct and proximate result of Defendants' breach of the confidentiality agreement, Plaintiff Ragner Technology has been injured.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays that the Court enter judgment against Defendants as follows:

A.    That Defendants' conduct constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.    That Defendants and their respective officers, directors, agents, employees, attorneys, and those persons in active concert or participation with any of them, be preliminarily and permanently enjoined from further unlawful actions set forth herein;

C.    That Defendants be ordered to pay Plaintiffs damages sufficient to compensate for Defendants acts, with pre-judgment and post-judgment interest, and that such damages be enhanced as provided in Sections 4 of the Clayton Act (15 U.S.C. §§ 15(a));

D.    That Plaintiffs be awarded such other and further relief as this Court deems proper and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury of all issues properly triable to a jury in this case.

Dated: April 21, 2018    Respectfully submitted,

         _____

Edward P. Bakos (ebakos@bakoskritzer.com)
Noam J. Kritzer (nkritzer@bakoskritzer.com)
**Bakos & Kritzer**
147 Columbia Turnpike
Florham Park, New Jersey 07932
Telephone: 908-273-0770
Facsimile: 973-520-8260

Counsel for Plaintiffs:
*Ragner Technology Corporation and
Tristar Products, Inc.*

28

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

Plaintiffs, by their undersigned counsel, hereby certify pursuant to Local Civil Rule 11.2 that the matters in controversy are not the subject of any other action pending in any other court or of any other pending arbitration or administrative proceeding.

Dated: April 21, 2018                         Respectfully submitted,

Edward P. Bakos (ebakos@bakoskritzer.com)
Noam J. Kritzer (nkritzer@bakoskritzer.com)
**Bakos & Kritzer**
147 Columbia Turnpike
Florham Park, New Jersey 07932
Telephone: 908-273-0770
Facsimile: 973-520-8260

Counsel for Plaintiffs:
*Ragner Technology Corporation and*
*Tristar Products, Inc.*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Plaintiffs, by their undersigned counsel, hereby certify pursuant to Local Civil Rule 201.1 that, in addition to monetary damages greater than $150,000, Plaintiffs seek injunctive relief, and therefore this action is not appropriate for compulsory arbitration.


Dated: April 21, 2018                              Respectfully submitted,

                                                   _____

                                                   Edward P. Bakos (ebakos@bakoskritzer.com)
                                                   Noam J. Kritzer (nkritzer@bakoskritzer.com)
                                                   **Bakos & Kritzer**
                                                   147 Columbia Turnpike
                                                   Florham Park, New Jersey 07932
                                                   Telephone: 908-273-0770
                                                   Facsimile: 973-520-8260

                                                   Counsel for Plaintiffs:
                                                   *Ragner Technology Corporation and*
                                                   *Tristar Products, Inc.*